1
2
3
4
5
6
7
8
UNITED STATES DISTRICT COURT
9
SOUTHERN DISTRICT OF CALIFORNIA
10

| | | |
|---|---|---|
| 11 | UNITED STATES OF AMERICA, | Criminal No. 08-CR-4229-JLS |
| 12 | Plaintiff, | **ORDER:** |
| 13 | v. | **(1)  GRANTING DEFENDANTS' MOTION AND RENEWED MOTION** |
| 14 | WESTERN TITANIUM, INC. (1), DANIEL SCHROEDER (2), | **TO DISMISS BASED ON STATUTE OF LIMITATIONS [Doc. Nos. 234 and 405];** |
| 15 | BRIAN MISAK (3), JOHN COTNER (4), | **and** |
| 16 | CHEEM ANG (5), MACH 2 METALS, INC. (6), | **(2)  DISMISSING COUNTS 2, 3, 4, 7 and 15 OF THE SECOND SUPERSEDING** |
| 17 | INTEGRATED TITANIUM GROUP I (7), INTEGRATED TITANIUM GROUP II (8), | **INDICTMENT** |
| 18 | Defendants. | |
| 19 | | |
| 20 | | |

21        Currently pending before the Court is a renewed motion to dismiss based on statute of

22   limitations filed by Defendants Western Titanium, Inc., Daniel Schroeder, and John Cotner.  Defendants

23   seek dismissal of Counts 2, 3, 4, 7, and 15 of the Second Superseding Indictment on the grounds that

24   these charges were brought more than five years after the date of the conduct alleged therein and that the

25   Wartime Suspension of Limitations Act, 18 U.S.C. § 3287, does not apply.  Having fully considered the

26   initial and supplemental motions filed by Defendants, as well as the Government's oppositions thereto,

27   the Court will grant Defendants' motion.

28

**Background**

Defendants were first charged in this matter on December 4, 2008, when the Government obtained an 8-count indictment alleging a conspiracy to commit fraud involving aircraft or space vehicle parts in violation of 18 U.S.C. § 38 and seven substantive counts alleging violations of the same statute. On August 18, 2009, the Government obtained a Superseding Indictment which again alleged a conspiracy to commit fraud involving aircraft or space vehicle parts, and further alleged 63 substantive violations of 18 U.S.C. § 38.

On August 25, 2009, Defendant Cotner filed a motion to dismiss 41 counts of the Superseding Indictment on the basis that they alleged conduct occurring more than five years prior to the return of the Superseding Indictment.   This motion was joined by all Defendants, and opposed by the Government (with the exception of nine counts which the Government conceded were time-barred). After hearing oral argument, the Court took the motion under submission.

On February 23, 2010, the Government filed a Second Superseding Indictment ("SSI") alleging a conspiracy to commit fraud involving aircraft or space vehicle parts, to make and present false claims in violation of 18 U.S.C. § 287, to make false statements in violation of 18 U.S.C. § 1001, and to commit mail fraud in violation 18 U.S.C. § 1341.  In addition to the conspiracy count, the SSI contains five substantive counts of fraud involving aircraft parts, eight substantive mail fraud counts, four substantive false claim counts, and one substantive false statement count, as well as criminal forfeiture allegations.

The SSI does not contain most of the counts disputed as time-barred in the Superseding Indictment,[1] but contains five counts which Defendants contend are barred by the statute of limitations: Counts 2, 3, 4, 7 and 15.

**Analysis**

The general federal statute of limitations, 18 U.S.C. § 3282, provides that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  Counts 2, 3, 4 and 7 of the SSI each allege crimes occurring in 2002, thus fall well outside the general five-year

---

[1]  Only one count from the Superseding Indictment alleged to be beyond the statute of limitations has been maintained in the SSI.  Count 4 of the Superseding Indictment is now Count 3 of the SSI.

period of limitations.  Count 15, a false claim allegation, alleges conduct that occurred from August 9, 2002 to January 23, 2006.

The Government contends that period of limitations for each of these counts is tolled by the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287.  During most of the time period covered by the SSI, until October 14, 2008, the WSLA provided as follows:

> When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancellation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress.

On October 14, 2008, the WSLA was amended to expand the operation of the Act to times "when the United States is at war *or Congress has enacted a specific authorization for the use of the Armed Forces as described in Section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b)).*"  18 U.S.C. § 3287 (emphasis added).  The amendment also lengthened the suspension period from three to five years and clarified that a presidential proclamation ending hostilities must be a formal proclamation with notice to Congress.

At issue in this case is the interpretation of the phrase "at war" in the WSLA prior to its amendment.  Defendants contend that the Act applies only when the there is a formal Congressional declaration of war, while the Government contends that the phrase "at war" includes any authorized military engagement that might compromise or impede the government's ability to investigate allegations of fraud.  It is the Government's position that the United States has been "at war" during the conflict in Iraq and that the WSLA suspended the limitations period for the charges in this case beginning on October 10, 2002, the date Congress passed the Authorization for the Use of Military Force Against Iraq Resolution of 2002.

There appear to be only two decisions discussing the application of the WSLA during times of military conflict other than wars formally declared by Congress.  In *United States v. Shelton*, 816 F.

1   Supp. 1132 (W.D. Tex. 1993), the court held that the United States was not "at war" during the Persian

2   Gulf conflict in 1991.  The *Shelton* court held that in order for the conflict to fall within the provisions

3   of the WSLA, Congress should have formally recognized the conflict as a war.  The court noted that the

4   judicial branch of the United States government has no constitutional power to declare a war and that

5   the "Congressional intent underlying the Suspension Act appears to have been more directly concerned

6   with such massive and pervasive conflicts as World War II."  *Id.* at 1135.

7       In *United States v. Prosperi*, 573 F. Supp. 2d 436 (D. Mass. 2008), the court held that the United

8   States was "at war" for purposes of the WSLA during the Iraq and Afghanistan conflicts that began in

9   2001 and 2002.   The *Prosperi* court concluded that "there is no compelling logic connecting a formal

10  declaration of war with the state of being at war" and that both the text and the legislative history of the

11  WSLA suggest the "at war" provision "was intended to capture any authorized military engagement that

12  might compromise or impede the government's ability to investigate allegations of fraud."  *Id.* at 449.

13      Although this Court initially was persuaded by the *Prosperi* reasoning, the Court must ultimately

14  conclude that the extensive post-hoc factual determinations required by *Prosperi* render its application

15  too ambiguous and uncertain in the context of a criminal statute of limitation.  Under the *Prosperi*

16  approach, the court should consider four factors in deciding whether the United States is "at war" for

17  purposes of the WSLA: 1) the extent of the authorization given by Congress by the President to act; 2)

18  whether the conflict is deemed a "war" under accepted definitions of the term and the rules of

19  international law; 3) the size and scope of the conflict (including the cost of the related procurement

20  effort); and 4) the diversion of resources that might have been expended on investigating frauds against

21  the government.  *Id.* at 449.

22      Although the *Prosperi* court carefully analyzes and details each of these factors with supporting

23  history, case law, treatises and statistics, and makes a strong showing why the United States should be

24  considered "at war" for purposes of the WSLA, the court's conclusion did not come until eight years

25  after the criminal conduct in question.  Whatever Congress intended by the phrase "at war" in the

26  WSLA, it cannot have meant a definition not capable of determination until a court conducts a

27  subjective analysis years after the commission of an offense.

28      The purpose of a statute of limitations is to limit exposure to criminal prosecution and to protect

08cr4229-JLS

1    individuals from having to defend themselves against charges when the basic facts may have become

2    obscured by the passage of time.  *Toussie v. U.S.,* 397 U.S. 112, 114-15 (1970).  Statutes of limitations

3    "may also have the salutary effect of encouraging law enforcement officials promptly to investigate

4    suspected criminal activity."  *Id.* at 115.  For these reasons, statutes of limitations "are to be liberally

5    interpreted in favor of a finding of repose."  *Id.* (citations omitted).  Because the WSLA creates an

6    exception to "a longstanding congressional policy of repose that is fundamental to our society and our

7    criminal law," it must be narrowly construed.  *Bridges v. United States*, 346 U.S. 209, 215-16 (1953).

8              With these principles in mind, this Court cannot construe the "at war" language of the WSLA as

9    broadly as the Government urges.  The uncertainty which results from the *Prosperi* approach is

10   completely at odds with the objectives of finality, notice, and prompt investigation sought to be served

11   by a criminal statute of limitations.  Therefore, given the ambiguity inherent in defining it otherwise, a

12   narrow construction of the term "at war" in the WSLA requires a finding that it encompasses only those

13   wars which have been formally declared by Congress.  The power to declare war is vested in the

14   Congress,  *see* U.S. Const. art I, section 8, cl. 11, thus, as the *Shelton* court concluded, for a conflict to

15   amount to a war under the WSLA, Congress must formally recognize that conflict as a war.

16             This construction is consistent with the legislative history of the WSLA, which was first enacted

17   during World War II.  Although contemporary usage of the term "war" may have broadened in light of

18   the subsequent military conflicts in Korea, Vietnam, the Persian Gulf and Afghanistan, the WSLA

19   originated during a time of formally declared war and during a time period during which it was probably

20   more commonly understood that the United States came to be in a state of war only through a formal

21   declaration of war.

22             The 2008 amendment of the WSLA to expand its application to times when the country is at war

23   *or* when Congress has enacted specific authorization for the use of military force also suggests that the

24   former version of the Act did not apply to Congressional authorizations of military force.  The Senate

25   Judiciary Committee Report recommending the amendment recognized that  "While the World War II

26   provision suspending the statute of limitations is still the law today, it applies only 'when the United

27   States is at war.'  18 U.S.C. § 3287.  As a result, the ongoing military operations in Iraq and Afghanistan

28   are likely exempt from this law because they were undertaken when Congress authorized the use of

1  military force, rather than by a formal declaration war."  Senate Judiciary Committee Report on S. 2892

2  at 4 [Doc. No. 259].

3  The Court recognizes that the Ninth Circuit has interpreted the phrase "time of war" in the

4  Federal Tort Claims Act far more expansively than the interpretation this Court is adopting here.  In

5  *Koohi v. United States*, 976 F.2d 1328, 1334 (9th Cir. 1992), the Ninth Circuit recognized that from a

6  practical standpoint, "time of war" has come to mean periods of significant armed conflict and that our

7  country's participation in a war not supported by a formal declaration of war "is in no way inconsistent

8  with the conclusion that a state of war or 'time of war' existed."   The statutory provision at issue in

9  *Koohi,* however, was an exception to the waiver of sovereign immunity for "any claim arising out of

10  combatant activities of the military or naval forces, or the Coast Guard, during time of war."  *Id*. at

11  1333, quoting 28 U.S.C. § 2690(j).  The *Koohi* court recognized that the purpose of the exception "is to

12  ensure that the government will not be liable for negligent conduct by our armed forces in times of

13  combat" and thus saw no reason for a distinction between combat authorized by the Congress or combat

14  following less formal actions of the Executive and Legislative branches.  *Id.* at 1335.

15  As Defendants point out, the distinction between *Koohi* and the case at hand is a matter of

16  differing standards of statutory interpretation.  When confronted with a purported waiver of sovereign

17  immunity, as in *Koohi*, courts must construe ambiguities in favor of immunity.  *United States v.*

18  *Williams*, 514 U.S. 527, 531 (1995).  On the other hand, criminal statutes of limitations must be

19  "liberally interpreted in favor of repose."  *Toussie*, 397 U.S. at 114-15.  Therefore, given the divergent

20  approaches required interpreting the two types of statutes, the Court cannot simply apply the *Koohi*

21  interpretation in this case.   While the statutory purpose of the sovereign immunity wavier exception

22  may not have been hampered by the broad definition of war applied in *Koohi*, a similarly broad

23  interpretation of the WSLA would not serve the statutory purposes of a criminal limitations period and

24  would be contrary to the Court's obligation to narrowly construe any exception to the policy in favor of

25  repose.

26  Finally, as to Count 15 of the SSI, the Court finds that the cause of action began to accrue in

27  2003, on whatever date Boeing first submitted a claim for payment from the United States.  *See United*

28  *States v. Rivera*, 55 F.3d 703, 707 (1st Cir. 1995) (civil False Claims Act violation is "committed, for

1    statute of limitation purposes, whenever [defendant's intermediary] can properly be said to have

2    presented its [claim] to the government.").   Thus, although it alleges conduct spanning from August 9,

3    2002 to January 23, 2006, Count 15 is also time-barred.

4          The Government cites *In re Pharm. Indus. Average Wholesale Price Litig.*, 498 F. Supp. 2d 398

5    (D.Mass. 2007), in support of the proposition that a claim under the civil False Claims Act accrues each

6    time a false claim is submitted.  Thus, under the Government's theory, the statute of limitations did not

7    begin to run until Boeing submitted its last claim for payment from the United States on January 23,

8    2006.  The *Pharm. Indus.* decision is distinguishable, however, because in that case the defendant

9    knowingly committed multiple false acts which, in turn, caused the submission of false claims to the

10   government.   In this case, however, the Defendants appear to have committed only one act, the mailing

11   of an invoice to Merco on August 2, 2002, which is alleged to have caused the submission of subsequent

12   false claims to the government.

13         Liability under the civil False Claims Act[2] is imposed only for the commission of acts which

14   cause false claims to be presented.  *United States v. Bornstein*, 423 U.S. 303, 313 (1975).  In *Bornstein*,

15   one corporation, United, provided three separately invoiced shipments of falsely branded items to

16   another corporation, Model.  This, in turn, caused Model to submit 35 false claims to the United States.

17   Rejecting the Government's claim that United should be liable for all 35 of Model's false claims, the

18   Supreme Court held that United was liable only for the three acts it undertook:

19         While United committed certain acts which caused Model to submit false claims, it did
           not cause Model to submit any particular number of false claims.  The fact that Model
20         chose to submit 35 false claims instead of some other number was, so far as United was
           concerned, wholly irrelevant, completely fortuitous, and beyond United's knowledge or
21         control.  The Government suggests that United assumed the risk that Mode might send 35
           invoices when United sent the falsely branded tubes to Model.  The statute, however,
22         does not penalize United for what Model did.  It penalizes United for what it did.

23   *Id.* at 312.

24         Extending this concept to the charges in this case, the Court must conclude that Defendants'

25   liability stems only from the alleged act which caused the false claims to be submitted by Boeing, the

26   submission of its invoice to Merco on August 2, 2002.  This cause of action accrued for statute of

27   _____

28         [2]  All of the cases cited by the Defendants and the Government discuss the civil False Claims
     Act, 31 U.S.C. § 3729 *et seq.*, rather than the criminal false claims statute, 18 U.S.C. § 1341, charged in
     Count 15.  Therefore, the Court presumes that it is reasonable to analogize between the two statutes.

limitations purposes sometime in 2003, whenever Boeing submitted its first claim for payment to the United States.  However, under *Bornstein*, the cause of action  cannot be deemed to accrue anew each time Boeing submitted a claim.

### Conclusion

For the reasons set forth above, the Court finds that the Wartime Suspension of Limitations Act does not apply in this case because the 2002 military conflict in Iraq was not a "war" declared by Congress.  Therefore, Counts 2, 3, 4 and 7 of the Second Superseding Indictment, which accrued in 2002, are untimely and barred by the general five-year statute of limitations.  Count 15 of the Second Superseding Indictment accrued in 2003 and thus is also time-barred.  Accordingly, Defendants' motion to dismiss Counts 2, 3, 4, 7 and 15 of the Second Superseding Indictment is **GRANTED** and those Counts are **HEREBY DISMISSED.**

**IT IS SO ORDERED**.

DATED:  July 1, 2010

Honorable Janis L. Sammartino
United States District Judge

08cr4229-JLS